Okay, we'll start the morning with Morris versus Philadelphia Housing Authority. Good morning, Your Honor. In this court, my name is Mark McCartney. I represent the plaintiff's appellant in this case, and I respectfully reserve two minutes for rebuttal. As granted. Mr. Morris, the plaintiff in this case, challenges the district court's decision to dismiss 11 instances of alleged free speech. Before we go any further, are you challenging that? No, I'm down to two. Two, but also there is no decision in the lower court with regards to the hostile work environment. So with respect to a pattern of a hostile work environment, I would say that you can take all the instances of speech into consideration. Mr. Morris, a complaint over the course of four or five years in 11 instances of waived in regards to free speech. I think you can take it as given that we know the factual Why don't you tell us why this is not, as the district court effectively characterized it, kind of right in the heartland of Garcetti that we're dealing with, that this would be constitutionalizing the employer-employee dispute to make this a First Amendment case. Of course, the decision focused on whether Mr. Morris was acting within his official duties. This case is distinguishable from any case, there was one case in the Ninth Circuit, but certainly in this circuit. In the Thornacre case, the decision by this circuit, there was a finding that the plaintiffs in that case were acting within their day-to-day activities in complaining about the bully trap. Sure, but here, as the district court saw it, these were complaints and observations and concerns that were being relayed, and taking Mr. Morris's complaint as true, I mean, serious matters that he was bringing up, but he was bringing them up to his supervisors, he was talking about it sort of within the chink. At least that's the way the district court understood it. Is the district court wrong in seeing it that way? No, but Garcetti instructs that internal complaints are not necessarily unprotected by First Amendment. In this case, there was complaints to another co-employee, the Executive Director. The Executive Director is not PHA, so he was compelled by the Executive Director to engage in activities that were prohibited by PHA, his employer. So, by the very nature, it could have never been within his official duties as a PHA employee to engage in the prohibited activities of lobbying and political activity. He came upon all this knowledge through his job, right? I mean, it wasn't sort of after hours, sneaking around people's offices. This was, you know, his job duties, right? Which was more compelling that he was made to work in prohibited activities as a PHA employee, being paid by PHA employees, when PHA prohibits that activity under their policies and procedures, and by laws, object. So, he was actually compelled by his supervisor to engage in prohibited activities. It's tantamount to a supervisor telling an employee to rob a bank. Was there an internal process in this agency to make a complaint? Did he do anything about that? I'm sorry, Your Honor. Was there an internal process? At PHA? Yeah, to solve the dispute. There is a mechanism, there's an office of compliance where employees can complain. Did he go to that? He did not. Well, why should we let him make a constitutional claim if he didn't use the process that the agency had to resolve things like this? Because the executive director who is responsible, the policymaker, was the one that the very person signed off saying that they wouldn't engage in prohibited activities of lobbying. Does that mean you don't use the internal process at all? If the employee who tells you to do something that you think is invalid or inappropriate is the one who does it, you just don't bother with the internal process? No, that would be more akin to petitioning under the petitioning clause. I don't understand what the petitioning clause has to do with this. Well, if he was going to make internal complaints, as he did... He did make internal complaints? He did, to his supervisor, to Carl Green, and to the director of TSSI. But he didn't follow internal grievance procedure, is what you're saying, right? I mean, to the extent there's some formal administrative mechanism for voicing the complaints that he had, he didn't follow that, right? Well, you're not compelled to file a complaint with the Office of Compliance, but, no, he did not follow that. What do you mean you're not compelled? I'm sorry, I don't understand. What do you mean he's not compelled? If there is a process, shouldn't he have followed the process instead of coming to court with a constitutional claim? Well, it's not a statutory process. It's not like filing a claim with the PHRC or anything like that. It's a way that employees can voice their concerns, but it's not required by an employee of PHA to go through this mechanism. But that's what whistleblowers are supposed to be doing, right? I'm sure it's an independent office. If it works like every other similar one, it's not an independent office. That's the thing. It's under the authority of the executive director. It's a PHA. It's not an independent organization. It's a PHA department. Well, as long as we're on the question of whistleblowers, what's your response to the Garcetti point that there are whistleblower protections out there and there are other mechanisms in state law for employees to address actions by their employer that they feel invade their rights and that it does a disservice to state laws and a disservice to government generally to take a case out of that system and turn it into a constitutional First Amendment discussion? What's your response to that line of argument? Respectfully, I believe that the First Amendment is tied on to the whistleblowers, the state whistleblower laws. The state whistleblower laws have different mechanisms. Of course, there's a different statute of limitations and areas of that nature. But the First Amendment is the First Amendment. That protects free speech. That's for sure. It sure does. But I understood Garcetti's point to be there are legal protections like the whistleblower law, and we should let those things work because that will be a better instrument to address the kinds of concerns that Mr. Morris had without the collateral consequences of turning internal government employer-employee disputes into constitutional issues every time they come up. What's your pushback on that line of reasoning from Garcetti? I believe that an employee, a public employee, can afford themselves of the First Amendment without running afoul of the state rules. You can do both. In both cases, if there's retaliation, they can be held liable, the government employees can be held liable for retaliation, and that's what happened in this case. I don't think you have to supplant one with the other. And in this case, there was a claim under the Pennsylvania whistleblower law as well as the First Amendment. And it still has that claim, right? Even after Judge Bailson said, well, you don't have a First Amendment claim, he didn't purport to say you don't have state law remedies, right? No. The court declined to exercise jurisdiction, but in the interim, now the statute of limitations is running, of course, it would be untimely. The acts of Mr. Morris were ultra-virus acts that he was compelled to perform by another employee. What happened to Morris? It's not clear to me from the briefs. Whatever happened to him? Was he fired? What happened? He was constructively terminated. Essentially, he was informed that his salary would be slashed by approximately 30%. Well, that happens to a lot of people in this economy. He was forced out because his salary was slashed. And because of the retaliation. Was he fired? No, he was not fired. He was retired. Essentially, he was constructively discharged. He was not terminated. But the conditions were made so intolerable that he was forced to resign. Do you believe that a supervisor's failure to act on an employee's complaint constitutes a violation of the First Amendment? No. The First Amendment violation was the act of compelling him to engage in prohibitive activities. Everything else was the product of that. For instance, when he was compelled to work at the Equity PAC, the political action group, the fact that he was compelled to work there was the very First Amendment violation. That's when he should have been afforded protection under the First Amendment. The fact that he failed to sign a state filing was just a product of that compulsion to work in that department. Let me hold you up there and ask you this. You say it was just clearly unlawful for him to have been asked to do these things that he says he was asked to do. But there was no reasonable way for anybody to understand this to be within a broad understanding of his responsibilities at PHA. Have I got your factual assertion right? Yes. And what do you understand your opposing party's response to that assertion about scope of duty? That as the executive director's advisor, it was part of his official duties. Why is that wrong? Why is that wrong? Well, first of all, there's nothing in the record that suggests that he was an advisor. In fact, the record is very clear. And then we have to go to the standard of Twombly and Dengick. All the record is very clear. We don't have to complain that he was in charge of supervision of troubled departments of PHA. That was not a troubled department of PHA. It's not even a department of PHA at all. It's absolutely independent of the state. So there's no evidence of record that he was the advisor of Carl Green. But even if he was, taking that argument as such, Carl Green is not the employer. PHA is the employer. That's a very important point because he was doing something that was contrary to the interests of PHA by working in a political action group that was prohibited under the PHA rules and under Sable. I know that the red light is on, but let me end up with the question that Judge Chigaris asked at the beginning. You don't challenge, do you, the holding, the district court's holding, that all the alleged instances of retaliation that occurred prior to October 14, 2008, are barred by the statute of limitations? Well, I argued at the lower court that there was a continuing violation. What are you arguing before us? Yes, I understand that there is a statute of limitations would bar. I think there would be three live claims that would be within the statute. You mean that would not be barred by the statute? I thought it was only two. I thought it was a complaint to Coney and Green about embezzlement from TSSI and expressions of concern regarding the Toys for Tots program. Yes, and I believe there was one other one. Well, no, at least those two didn't have anything at all to do with lobbying efforts. But I would also, again, as my previous argument was that it was a hostile work environment, and the court did find that under those circumstances you could take all the speech into consideration  This is over a 10-year period, right? Approximately 10 years. Approximately 10 years, yes. Okay. Thank you. Thank you. Good morning, Madam Chief of Court. My name is Michael Bowman. I'm Bowman's partner, so I represent Philadelphia Housing Authority. Oh, am I correct that we're going to have four people argue on your side, including one, for one minute? It takes one minute to get up and get to the podium. That is correct, Your Honor. But I may not use all of my time. It depends on the bench. There are four different defendants. Obviously, Philadelphia Housing Authority is the primary defendant, but there are individual defendants, and another entity, TSSI, that is a defendant as well. Maybe you could get right on this point. What is your response to the assertion that there is no way that the lobbying activities could possibly be considered within the scope of Mr. Morris' duty, and so Garcetti's concern just flat doesn't apply? The case's response to that is as follows, Your Honor. Number one, what the trial court does very well is to summarize what the retaliation allegations are. What the trial court does not do is set out what the predicate facts are, which would lead the trial court and should lead this bench to the proposition that all these allegations should be dismissed by Garcetti. First of all, in paragraph 25 of the complaint, Mr. Morris alleges that his duties included the supervision and oversight of various troubled departments, MPHA included, importantly, for this purpose, non-profit organizations, which would include TSSI, which would also include non-profit organizations, but principally instituted for affordable housing professionals. Sure, but he says he doesn't have anything to do with the PAC. He didn't have anything to do with it, didn't want to have anything to do with it, and shouldn't, under law, have had anything to do with the political activities that he was drawn into. And that's what your opposing counselor, Mr. Polizzi, has been emphasizing, and I'm trying to respond to that. What Mr. Polizzi and his client allege in the complaint is that he was, at a certain point, tasked to assist Asia Company and TSSI, and actually moved his office to TSSI's offices. In that capacity, he alleges, he was asked to take part or assist with respect to this equity PAC. So to the extent that PHA required him to assist TSSI, and also assist equity PAC, those were part of his duties. I thought if his duties were to take care of, to work with a troubled agency, I'm the only Philadelphia among the panel, I thought all of PHA was troubled. And wouldn't that mean that that was part of his duties? Well, I mean... I mean, from the newspaper. I'm a little conflicted as to whether or not I'm going to say that my client was troubled at the time or not. But what I will say is that... Well, let's say the press thought it was troubled. Sure. What I will say is that what the plaintiff alleges is that part of his responsibilities were non-profits. But he... Mr. Pawlenty presents to us, and this is what I'm hoping to get you to answer, that it could be, in fact, it would be unlawful. And tell me if he's wrong about the law. It would be unlawful for PHA to have said, Mr. Norris, you help out on this political action committee. That's part of your job. He says that's against the law. Just like, as he put it, if they said part of your duty is to rob the bank. They couldn't lawfully direct him to do that. So any assertion that it was within his job duties from Stracone to say help me out on this PAC, just, it can't be. No, I think the response to that, Your Honor, is that even if that were the case, that... But isn't the case... Well, let him finish. Well, I'm not here to... I'm not going to say whether that is the case. I don't believe that was the case. What Mr. Norris's job responsibilities were at that time were to assist TSSI. That's what his responsibilities were. Equity PAC was housed within TSSI. Equity PAC was a TSSI-based organization. So as part of that, as part of helping, assisting TSSI, which was part of his job responsibilities, that's what he did. But even assuming, for the sake of argument only, that that was a violative of the law in some way, shape, or form... When you say that, you mean even assuming that he was directed to work on equity? Because that's the factual evidence we want you to have. Well, assuming, as you're saying, Your Honor, that him working on Equity PAC was a violation of the law in some way, shape, or form. Even if you assume that, Garcetti would still apply. As a matter of fact, I know counsel is going to come after me. There's another case that has been cited in this case on Brewster, which is another district court case, where a police officer basically opposes pushing demonstrators off campus because he believes he was violating their civil rights and he may be subject to some kind of... Sanction. Lawsuit or sanction as a result. The fact that he feared that he was violating the law was of no moment with respect to his rights. There's a distinction here, Mr. Bowman, that I'm hoping to get you to grapple with. This isn't the circumstance where... In Allen Brewster, the assertion by the police officer... The police officer never would have said, My job is not to be a police officer. My job is not to go out and help with crowd control. What he said is, within the bounds of that job, I don't think I should be doing that particular thing. What I understand the argument to be from the plaintiff here is, My job was to work with PHA and trouble pieces of PHA, but it was never to be involved in political activity. That's the difference between being a police officer and being a short order code. It's just a different job. It's a different thing. They were making me do this different thing, and that, in fact, that different thing is against the law. I shouldn't have had to do that. First, as a factual matter,  that they did make him work on the equity pact thing. Is it correct for them to say, By making me do that, they took me outside the bounds of my job responsibility in PHA? I think the answer to that in honor is no. And the answer to that is no, again, and I come back to this, is because, number one, the case law is clear that what people do in their jobs is not limited by a job description that's written on a piece of paper. Having a job is an organic thing. Responsibilities change over time, depending on the circumstances. And therefore, I'm not sure where you're going. And therefore, with respect to what Mr. Morris was tasked to do, he was tasked to assist TSSI in whatever TSSI was doing. TSSI and equity pact are different things, so you can see that. They're certainly different entities, but they're related entities. Equity pact was, as the record reflects, as is alleged in the complaint, equity pact was created by the principal of TSSI for purposes of advocating issues that PAL? I'm sorry. Principal of PAL, yes. For purposes of advocating positions that are important to TSSI, to the extent that Mr. Morris was there assisting TSSI and was asked to help with equity pact as well because that was related to TSSI, and again, the allegations in the complaint are clear that they are related, then there is no issue with respect to Mr. Morris working outside of what his job responsibilities were. Those were his job responsibilities. I see my red light is gone. Thank you. Thank you. Thank you. Then we'll have the beginning of this series of lawyers. Ms. Knox? I guess you're Ms. Knox. Good morning, Your Honor. May it please the Court? My name is Holly Knox, and I represent Carl Green. Let me begin by saying that there are only two appealable issues here, and the others have been moved or abandoned, so we only have the first amendment retaliation issue and the qualified immunity issue before us. Is his position any different than the position that Mr. Bowman just took? No, it's not. So why do we have two lawyers getting up with the same issue? I was simply going to address the issue of qualified immunity. Okay. That's definite. So first and foremost, we adopt the arguments that Mr. Bowman has made on behalf of PHA. Our setting applies. I disagree with your colleague, though. Do we even have to get to qualified immunity? I think you do, Your Honor. I simply want to address it because it was raised on appeal, and our position is that, you know, obviously if there's no constitutional violation, then qualified immunity need not be addressed. But to the extent that we did find that, for example, that Garcetti does not apply here, I would still argue that the individual defendants in this agreement are entitled to qualified immunity. Under qualified immunity, the law would have to be clearly established to indicate to those individual defendants that there was some sort of constitutional violation. And you mean until Garcetti it wasn't clearly established? Is that basically your point? My point, Your Honor, would be that as of 2006, when these events began and when Garcetti was on the books, that Garcetti and Farquhar and the other third circuit precedent would indicate to the individual defendants that it's not clearly established that they can't do what they're alleged to have done. And therefore, because it's not clearly established, they're entitled to- It wasn't clearly established that they weren't to tell somebody to- I'm not sure I understand your position. Because that's the point, right? Their assertion is the law is pretty clear that it was unlawful to make me work in political stuff, that they couldn't make me do that and they made me do that. Is it your position that that wasn't clearly established? Correct. Our position is that with Garcetti on books, it's pretty clear that what was going on here was part of official duties, and therefore, because it was part of official duties, it is not a First Amendment violation. If you assume these facts and assume there was retaliation, it would have fallen within the Garcetti exception. Is it important? Do we need to know or address whether the plaintiff's assertion is correct that it's unlawful for them to have directed him to work in equity pay? I don't think you do, Your Honor. I would agree with Mr. Bowman. I was going to talk a little bit about Armbruster, because I think to me that's the best case within the district and the circuit that addresses these facts where you have someone who's saying, I don't want to do this because I think this is unlawful or I think this is going to violate someone else's rights. Okay. I know your red light is on, but Judge Chigaris wants to ask a question. Thank you. Do you know anything about the whistleblower law? And if so, was the plaintiff's duty bound to go to whatever the independent internal person to complain? I don't know whether or not he has an obligation internally through PHA's policies to do that. I mean, I think that he has a whistleblower claim. Or under state law. Right, or under state law, and he brought that claim. And so that may be an appropriate venue for him to seek a remedy, but I think that with respect to the First Amendment issue, I think that GARCETTI does not allow him to go forward. Are you a city employee? I'm just trying to figure out who all these lawyers are. No, I work at Haynes & Associates, and I represent Caldwell. Personally? Yes. Okay. Thank you. Okay. The next two minutes. Good morning. My name is Sid Steinberg, and I represent Diane Rosenthal individually with respect to this matter. And Ms. Rosenthal does stand in a slightly different position than the other individuals in this matter, and that's because initially Mr. Pelleggi has already agreed that the only specific act that she's alleged to have engaged in, that is ignoring a complaint, does not rise to the level of an adverse action that is sufficient to state a First Amendment retaliation claim. So we then take that and take that. Well, who was Diane Rosenthal? Ms. Rosenthal was essentially the bookkeeper, the chief bookkeeper. She's alleged to have been responsible for fiscal audits and for writing checks. The only specific allegation with respect to her is that Mr. Morris allegedly came to her and said that two of his bills were in bezel funds. That occurred in February of 2008. That has nothing to do with working on politics. It has absolutely nothing to do with the lobbying or the PAC issues or anything that's been discussed so far. So the point with respect to Ms. Rosenthal is that there's simply no claim alleged with respect to her individually under the Orange Bomber in order to tie her to the causal connection between the alleged adverse action that is the complaint. Okay, what did Judge Baleson say about her? I'm sorry? What did Judge Baleson say about her? Judge Baleson said initially that potentially ignoring a complaint could be an adverse action that's under a district court decision of New Jersey. We would submit that that's incorrect under the McKee standard of what is an adverse action. And then he did not address specifically her involvement in the viable adverse action that is the constructive discharge. Your red light is on. I mean, that's what happens when you have four people arguing for one position. Okay. Thank you, Your Honor. Thank you. Okay. Mr. Booth, you want to get up? You need to take a minute to get up and say what you have to say. It's ridiculous. Your Honor, I see my woman. Thank you. Well, thank you. Okay. You have the floor. I would just like to address two points. With respect to Armbruster, first of all, the Third Circuit had no opportunity to review the First Amendment element of Armbruster. That was actually abandoned on appeal. Sure, but is that your best pitch? Seriously, because in Armbruster the police officer says, I just don't want to do that thing. But clearly that thing is the sort of thing that police officers do, crowd control, right? Well, the police officers in Armbruster, that police officer, the colonel, was on his official duties. That was clear when he went to the demonstration. He was also acting in his official duties when he told the demonstrators to move. And then the third element was that he was insubordinate to his supervisors. So there was a finding at the lower court that Armbruster, that he was acting within his official duties. The other point I just wanted to touch on, first of all, Ms. Rosenthal was the head of the finance department throughout PHA. She wasn't the head booking, but she was the head of finance. She was the one that was immediately involved in cutting checks to TSSI. But she wasn't responsible for an adverse action against your client, though. She personally received a complaint. She received a complaint. She also engaged in some of the activities that were part of my client's objections. She participated in some of the activities as part of your client's actions. Like what? When Ms. Knox got up here, she said the only thing she did was not respond to a complaint. No, with respect to the embezzlement, Ms. Rosenthal actually approached Mr. Morris and requested that he make arrangements for the director of TSSI, Ms. Cooney, and another individual to actually enter into some agreement to pay back the money, which was never done. Okay. She was involved in some of the financial improprieties at TSSI. Thank you. You're a red light. This is what happens. I just tell all the lawyers that are here, this is what happens. I don't know why we allowed this. For four people to argue in a case.